liWALTZER, Judge.
I. STATEMENT OF THE CASE
On January 9, 1995, defendant Huey Randolph was charged by a bill of information with possession of cocaine in violation of LSA-R.S. 40:967 and possession of phencycli-dine in violation of LSA-R.S. 40:966. Defendant initially pled not guilty and filed a motion to suppress. After a hearing the trial court denied the motion to suppress. Defendant sought writs to this court, which were denied. On March 29, 1995, he withdrew his plea of not guilty and entered a plea of guilty under State v. Crosby, 338 So.2d 584 (La.1976) and was sentenced on count one to five years in the custody of the Department of Corrections with credit for time served and on count two to ten years in the custody of the Department of Corrections with credit for timé served. Also on March 29,1995, the State filed a multiple bill seeking to have Huey Randolph declared a multiple offender under LSA-R.S. 15:529.1 citing his February 23, 1983 conviction in Case Number 293-562 for Attempted Aggravated Rape. Defendant pled guilty to the multiple bill and was sentenced thereon to ten years to run concurrently with any other sentences. Defendant appeals.
II. ERRORS PATENT
We have reviewed the record for errors patent upon the face of the record and have found none. In reviewing the multiple bill conviction we noted the following on the issue of the cleansing period.
|2The version of LSA-R.S. 15:529.1(C) in effect on March 29, 1995 when defendant was billed and pled guilty to the habitual offender statute provided as follows:
This Section shall not be applicable in cases where more than seven years have elapsed since the expiration of the maximum sentence, or sentences, of the previous conviction or convictions, or adjudication or adjudications of delinquency, and the time of the commission of the last felony for which he has been convicted. In computing the period of time as provided herein, any period of servitude by a person in a penal institution, within or without the state, shall not be included in the computation of any said seven-year periods.
Defendant was convicted of Attempted Aggravated Rape on February 23, 1983. February 23, 1983 to March 29, 1995 is a period of 12 years, 1 month and 6 days. Under the statute in effect and quoted above, convictions earlier than seven years before the instant conviction cannot be used for multiple bill purposes, however, a period of incarceration interrupts the running of the seven years. Thus, if defendant was incarcerated, for example, for 10 years the prior conviction may be properly used, but if he was incarcerated for less than 5 years, 1 month and 1 day, it can not be used for multiple bill purposes. The record before us does not indicate the period of incarceration.
Whether the predicate convictions in a multiple offender ... prosecution are considered essential elements of the offense (citation omitted) or essential averments of the bill of information (citation omitted), the state bears the burden of establishing their constitutional validity, if they came by way of guilty pleas, and of proving the convictions at trial, (citations omitted) The State also bears the burden at trial of negating the cleansing period ... State v. Mobley, 592 So.2d 1282 (La.1992).
In the instant case, defendant pled guilty to the multiple bill. Although the record does not reflect the date of actual *415 discharge from supervision which commences the cleansing period, the colloquy and Waiver of Constitutional Rights and Plea of Guilty Form show that the State carried its burden of establishing ^constitutional validity. Where the defendant enters a constitutionally valid guilty plea to a multiple bill, the record need not reflect the actual date of discharge for purposes of triggering a cleansing statute.
III. FACTS
Officer Ricky Laney Blanchard testified that on November 10, 1994 at 11:30 p.m., he and Officers Donald Pierce, Michael Harrison, Danny Scallin, Jake Snappy and Gay Favrot were patrolling for juvenile curfew violators in the Melpomene Housing Project. They parked their cars in the 2400 block of Thalia and walked to the courtyard located in the 2400 block of Martin Luther King. When they turned the corner of the building and walked into the courtyard, they observed Mr. Randolph at which time he observed the officers. Mr. Randolph turned away from the officers and began “adjusting” or “fumbling with” his waistband. His back was to the police and at this point the officers thought that Mr. Randolph was going for a gun so they rushed him, put him on the wall and conducted a pat down search at which time they located a gun outside of his clothing and between his knees. Upon locating the gun, they placed him under arrest and searched him incident to the arrest, aware that he might have other weapons as well. At this time the officers found the defendant in possession of a small brown bottle containing POP, one hand rolled cigarette, two folded $1 bills which contained a white powder later found to be cocaine and $68 in currency. After the search incident to the arrest, the officers checked the action, of the gun and found that it was a pellet gun. Officer Blanchard testified that it looked and felt like a gun and had the weight of a gun such that it was only upon checking the action of the gun that the officers discovered that the gun was a pellet gun. We note that a pellet gun is still capable of inflicting great bodily harm and that many Ldrug dealers now carry pellet guns, which do not require licensing and thus are easily available, in the mistaken belief that carrying a concealed pellet gun is not carrying a concealed weapon.
Officer Ricky Blanchard testified:
A. We located to the Melpomene Housing Development and parked our vehicles in the 2400 block of Thalia. Myself along with my partner, Donald Pierce, Officer Michael Harrison, Officer Danny Scallin and Jake Snappy and Gay Favrot, we walked over to the 2400 block of Martin Luther King Courtyard, attempting to locate some juvenile curfew violators, that’s usually where they hang out at. So, when we walked over there we observed Mr. Randolph at which time he observed us and began adjusting his waistband. At this point myself and my partner, I guess, you could say, we rushed him, we didn’t know if he was going for a gun or whatever, we put him on the wall and conducted a pat down search of him. At that time, my partner located a weapon which was between his legs.
Q. Inside or outside of his clothes?
A. It was on the outside of his clothing. And after finding the weapon, we placed him under arrest and after placing him under arrest, we did a search incident to an arrest and he was in possession of a small brown bottle which we believed contained PCP, one hand rolled cigarette, two $1 bills which contained a white powder residue and $68 in currency.
Q. Just for the record, when he saw the police officers, his actions were he turned away from you?
A. Yes.
Q. What was he doing with his hands?
A. When he observed the officers, he turned away from us and began adjusting his waistband. Since his back was to us, we didn’t know what he was going for, so we thought he was going for a weapon, so, I guess, you could say, we rushed him and put him on the wall and conducted a search, a pat down search.
*416 The cross-examination of Officer Ricky Blanchard provided:

Examination by Mr. Frankowski:

Q. I have just one more question.- Did you at any time suspect Mr. Randolph as being in violation of a juvenile curfew since that’s what you were there for in the first place?
IgA. No, sir. But his actions alarmed us when he saw us in uniform.
Q. Again, the waistband adjustment, that’s what alarmed you?
A. Not only the waistband adjustment, but when he saw us in uniform, he saw us, he turned away from us and started fumbling with his waistband. And not knowing if he was going for a weapon, we relocated over there and patted him down'.
[[Image here]]

By the court:

All right, the Court believes under the totality of the circumstances, the Officers actions were justified so the Court finds probable cause and denies the Motion to Suppress the Evidence.
IV. ASSIGNMENT OF ERROR
The defendant raises one specification of error, namely, the trial court erred in denying defendant’s Motion to Suppress the Evidence. In support thereof defendant cites the case of State v. Williams, 621 So.2d 199 (La.App. 4th Cir.1993). Defendant states in his brief:
In Williams, the defendant was confronted by the police at the Iberville Housing Projects. Id at 200. The officers were on routine patrol and without suspicion when they encountered Williams. Id at 201. When Williams saw the approaching uniformed police officers, he turned immediately, quickly walked away, and was observed by an officer going “into his waistband area with both hands”. Id at 200. The police suspected Williams may have been in possession of a weapon; the officers detained and frisked him, and found a pipe with cocaine residue on his person. Id. at 200. The Court held on these facts that the trial court had erred in denying the defense motion to suppress the seized evidence. Id.
The facts of the case at bar present a virtually identical police-citizen encounter. The police were on patrol looking for juvenile curfew violators. The appellant was hanging out in the courtyard with a few other people. When appellant saw police approaching, he turned and adjusted his waistband. In reaction to his actions the police “rushed him”, detained him, and frisked him. The appellants actions were not sufficient for an investigatory stop.
Without articulable knowledge of suspicious facts and circumstances, the police are not allowed to infringe upon a suspect’s right to be free from governmental interference. State v. Hathaway, 411 So.2d 1074, 1079 (La.1982). Mr. Randolph’s actions of merely turning and adjusting his waistband could not have led police to ^reasonably suspect that he was committing, had committed, or was about to commit an offense, therefore, the police had insufficient grounds for a stop and frisk. As a result, all the evidence seized in this case pursuant to the improper stop and subsequent search should have been suppressed.
In Williams, supra, at 201, the court indicated that it did not believe those police officers’ testimony that they thought Karry Williams was going for a gun, when the court stated:
It is unreasonable given the facts of this case that the officers believed that the small pipe in the defendant’s waistband was a gun.
In the instant case, we, like the trial court judge, find the testimony of Officer Ricky Blanchard credible. We find, as did the trial court judge, that Officer Blanchard believed himself to be in imminent danger of losing his life or receiving great bodily harm.
The defense has attempted to characterize the instant case as a C.Cr.P. Art. 215.1 Terry v. Ohio [1] type search. In all of the Art. 215.1 Terry-type cases which this court has re *417 viewed, the officers believed that the defendant was engaged in some type of criminal conduct other than possession or use of the gun as the initial or primary reason for the approach, and after the approach for that other primary potentially criminal conduct, the defendant then secondarily engaged in some physical movement such as fleeing or reaching for the gun.[2] State v. Finne, 92-[25557 (La.App. 4 Cir. 2/11/94), 632 So.2d 819 [drugs]; State v. Solomon, 93-1199 (La.App. 3 Cir. 3/2/94), 634 So.2d 1330 [drugs]; State v. Sterling, 94-0794 (La.App. 4 Cir. 7/27/94), 641 So.2d 696 [drugs]; State v. Jackson, 26,138 (La.App. 2 Cir. 8/17/94), 641 So.2d 1081 [drugs]; State v. (Jack) Williams[3], 572 So.2d 756 (La.App. 4 Cir.1990) [drugs]; State v. Patterson, 588 So.2d 392 (La.App. 4 Cir.1991) [trespass of an abandoned dwelling]; State v. Belton, 441 So.2d 1195 (La.1983) [drugs]. In the instant case, it is admitted that the Officer did not believe that Huey Randolph was in violation of curfew or that he was dealing drugs or engaged in any other primary criminal conduct. The officers only “rushed” or approached the defendant when he went to pull a gun. The officers actions in the instant case are not an investigatory stop under Terry, but rather they were acting in self-defense where they felt themselves to be in imminent danger of losing life or receiving great bodily harm. We further note that unlike the Williams case, supra, the defendant in the instant case was in fact in possession of a gun. This court is wont to hold that where a police officer has made no attempt to stop an individual and that individual turns to conceal his actions and reach for a gun, the officer can take no steps towards self-defense. If this court were to hold that a police officer can take no steps in furtherance of his own self-defense until the fraction of a second later when the gun is pointed at him, I doubt that we will find individuals willing to be police officers. We find that the trial court did not errjgin denying the motion to suppress.
For the reasons discussed, defendant’s conviction and sentence on counts one and two and the multiple bill are affirmed.

AFFIRMED.

. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

. While it could be argued that the possession of the pellet gun is the offense that the suspect "is committing, has committed, or is about to commit” under C.Cr.P. Art. 215.1, this is a 20/20 hindsight analysis that is contrary to the state of mind of the officers prior to Randolph’s pulling the gun.
Prior to the defendant turning and reaching into his waistband, the officers had no suspicion that Huey Randolph, obviously older than the juvenile curfew requirements, was engaged in any criminal activity and there is no indication that they intended to make an investigatory stop of defendant Randolph. The officers did not know or suspect that Huey Randolph had a gun until he went for it, hence it could not have been the primary criminal activity justifying an investigatory stop. This case is not an investigatory stop case at all; it is a self-defense case. If defendant Randolph had gone for his gun and the officers had shot him in self-defense, it would have been justifiable homicide under LSA-R.S. 14:20. It would be ludicrous for this court to hold that police officers can defend themselves by shooting the aggressor, but not by disarming the aggressor.

. The other Williams case discussed in this opinion is State v. (Karry) Williams.